The next case this morning is 524-0622, People v. Lovett. Arguing for the appellant is Jonathan Krieger. Arguing for the appellee is Sharon Shanahan. Each side will have 10 minutes for their argument. The appellant will also have 5 minutes for a butthole. Please note, only the clerk of the court is permitted to record these proceedings today. Good morning, counsel. Good morning, your honor. Justice Barbaros is not with us today. He couldn't join us, but he is on the panel and as you both are well experienced, the audio will be available to him to listen to the arguments and he has the briefs. So, we will proceed without him today. Mr. Krieger, are you ready? I am, your honor. Okay, you may proceed. May it please the court. Again, Jonathan Krieger for Larry Lovett. In our briefs, we argue that my client's statements should be suppressed based on multiple constitutional violations. This morning, I plan to discuss two of the bases. The detective's use of an illegal, question first, warn later procedure, and our argument that the police's exploitation of my client's incapacitated state rendered the confession involuntary. I will, of course, be happy to answer any questions that your honors have about other aspects of the case. First, when the detectives questioned my client in the hospital, where he was recovering from major surgery, they were improperly delayed giving Miranda warnings, violating Missouri v. Siebert. As shown by the video of later questioning, the use of this illegal procedure was deliberate and there were no intervening circumstances. The statement should therefore be suppressed. At the suppression hearing, there was a dispute over what happened before the police turned their phone camera on. My client testified that the officers confronted him with supposedly inculpatory evidence, questioned him, ignored his invocation of the right to silence, and threatened a long prison term if he did not talk. The detectives claimed to have faulty memories, but when they did remember, testified that there was no confrontation, no interrogation, and no invocation. But the later interrogation video supports only my client's account. In it, on a video recording, he asks a detective about alleged evidence, fingerprint on a taser. In response, the detective admits to this evidence and thus to the confrontation. At this point, the circuit court did not make a credibility finding, but this exchange and other exchanges show that the detectives gave false testimony at the suppression hearing. In addition, the officer's use of this technique was deliberate. My client did not volunteer a confession, but he responded to questions designed to elicit a confession. Then the officers used that admission to start the second recorded part of the interrogation when they did Mirandizing. In addition, there were no intervening circumstances. Nothing would cause my client to distinguish between the different stages of the interrogation. The same officers questioned him about the same topics, and there was no warning about not using the earlier unwarned statements. This, in short, was a classic Siebert violation requiring suppression of my client's statements. The only question, then, is a threshold one, whether my client was in custody. Here, the question is whether a reasonable person in my client's situation could end questioning. This is the standard because no one disputed that my client could not leave the hospital room. He was recovering from surgery from a gunshot wound to repair his kidneys and intestines, and he was weeks away from release from the hospital. Not only could he not leave the room, but he was incapacitated. The video shows a person evidently very weak, whispering, nodding instead of talking, giving unresponsive answers, and drifting off. My client's weakness put the officers in absolute control over the questioning. Given this control, any reasonable officer would put off questioning until a later date when my client's health had been restored. Mr. Krieger, when they first showed up, didn't they put off the questioning? Didn't he say he was tired, and they honored that? There was a dispute over the nature of the invocation on December 11th. The officers testified that my client had said that he did not want to talk to them that day. My client testified that he had told them that he didn't want to talk to them at all. But either way, they honored that. They left. If he had told him, under their account, they honored it. Under my client's account, if he said he didn't want to talk at all, it's not clear that they could have come back the next day. And certainly, under my client's account, when they returned and said, we know you said you didn't want to talk, but here's some evidence against you, and he again invokes, that would be a clear Miranda violation. But we don't need to necessarily credit solely my client's accounts when the two different accounts conflicted, because as noted, the officer admits on the recorded video that there was some confrontation off camera, which shows my client's account was correct, and the officer's account was not correct. The officers' questioning also deepened the atmosphere of police control. The officers were alone with my client. They outnumbered him. They told him he had to explain why he was at the shooting, and they said they would wait, but this was said in calm tones. They were not yelling, but it was no less coercive. Courts have recognized the illegality of more subtle forms of police coercion. The officers also showed their belief in my client's guilt, which was consistent with a custodial interrogation. They cited evidence real and false against him, so they knew he was at the shooting scene and asked what sort of criminal intent he had. If my client's testimony is credited, and as noted, it was the only testimony that was corroborated, the officers also ignored his invocation of the right to silence and selectively recorded their interactions with my client, further asserting control. Any reasonable person in my client's shoes would have not felt free to attend the questioning, and since he was in custody, the Siebert violation requires suppression of the statements. Now, with regard to the voluntariness, the police elicited an involuntary confession from my client. Here, the standard is whether my client's will was overborne and his right to self-determination critically impaired. My client's capacity for asserting himself was already undermined by his weakened physical condition. The video shows that my client is out of it. His eyes are closed. He often doesn't speak or he whispers. He appears to lose consciousness. He gives non-responsive answers. The detective on video said he was surprised that my client could initial the Miranda waiver, given how much pain he was in, and the detective said he himself would put the date down so that my client wouldn't quote unquote overdo it. Any healthy person and most sick people would have the capacity to put their initials down on the paper. This case is comparable to the US Supreme Court case in Mincy and the appellate court case in Sandifer, which we cited in our briefs, but the state did not address. In this case, the detectives exploited my client's weakened state with a series of improper tactics. They confronted him pre-Miranda, they cited false evidence, they ignored my client's invocations, and they engaged in pressure tactics. Given this constellation of coercive tactics, my client's statement was not voluntary and should have been suppressed. Unless your honors have any questions, I would ask that your honors reverse the ruling of the circuit court and suppress my client's statements. Thank you. Mr. Moore? No questions. Your client did testify during the hearing, right? That's right, your honors. And at one point, he said that he was receiving OxyContin and Fentanyl, which caused him not to be as lucid as he probably should have been, correct? That's right. And they brought the doctor in to say that he wasn't getting anything much more than Tylenol. That's not correct, your honor. The doctor testified he was getting OxyContin. He was getting OxyContin? That's right. And was he getting the lowest dose? My memory has failed me on that. Yes, and I can see why the state argues he was given the minimum dose. The testimony was that he was given the starting dose. And there was no finding the detective's, excuse me, the doctor's testimony. The doctor didn't give an account of how much pain he was in. The doctor didn't really remember what had happened. The doctor was looking at her notes, which indicated that she'd asked three questions, who my client was, what time it was, and where he was. The doctor did not remember the response, but that based on those questions, the doctor found that he was alert and oriented. But if you watch the video, you can see he's not alert. He falls asleep at the end of the first interrogation. And the question of whether he's oriented, I think the video also rebuts that. He sometimes doesn't answer the questions that are asked. He nods off. And the question really isn't whether he's alert or he's oriented for voluntariness, it's whether he had the capacity of self-determination. This shows, the video shows that he did not. Counsel was, this was in the hospital room, right? That's right. And were the officers in uniform or were they in civilian clothes? On the video, you can see one of the detectives is in plain clothes. I don't remember if there was testimony about the other officer, but in People v. Logan, the court found that a lot of the factors that were cited by the circuit court, like the lack of handcuffs, that sort of thing, did not outweigh the evidence that the police were controlling the situation. That's exactly what happened in this case, that there are some factors suggesting that he wasn't in custody, but they're far outweighed by the factors shown he was in custody. And that's a de novo review. So there's no deference necessary in that way. Counsel. Your client never voiced to the officers that he was in pain, did he? That was something suggested by the officer? Yes, the officer saw that he was in pain and said, how do you feel? And he said, there was kind of, I think there was like no response. And then he said, except for the pain down there, or do you feel hungry? And the client had not had a bowel movement for several days. He wasn't eating. And he said, except for the pain down there. And my client nodded, indicating that he wasn't in pain. Yeah. Except for the time your client kind of nodded off a little bit in watching the video, it seems that there were responses to the questions, that there were at least appropriate responses to the questions. There were some responses that were appropriate, and there were some that were not. If you look at starting at, for the first one, minute 5, 24 seconds, he's asked, was Will with you guys when you dropped him off? And, or did you guys drop him off somewhere else? So it's an either or question. And my client nods, which doesn't, isn't an indication either way. Then the officer asked, what did you guys do with the guns? And admittedly, my client's response isn't clear, but he seems to be responding to a previous question about when he was dropped off. So some of the answers were responsive, but not all of them were. And if you're going to watch the video, you can see at the very end, he goes to fall asleep or lose consciousness. Okay. Mr. Krieger, you'll have a few minutes after Ms. Shanahan. Justice Moore, any other questions? No. Okay. Ms. Shanahan for the state. Thank you, Your Honor. May it please the court, counsel. My name is Sharon Shanahan, and I represent the people of the state of Illinois. Before getting into the law of this case, I'd like to address a couple of the questions this court had. First of all, Justice Cates, you asked about whether the defendant had, or the police had honored the defendant's invocation not to talk on the previous day, December 11th. And that is correct. They did honor it. I do not see any question of that whatsoever. They came in, he said he was tired. They said, we'll come back. And they left. They honored it. They also honored it the day after. At the end of this video, they say, or Officer Mormon says, I'll probably be back tomorrow. And he does come back tomorrow. And at that time, the defendant says that he doesn't want to talk and they left. So A, the police know how to honor the defendant's request not to talk. And B, the defendant knows how to request that he should not talk. So I think that's important. I think that you are correct, Justice Cates, that at the hearing, the defendant said that he was on OxyContin and Fentanyl. And neither one of, well, he certainly wasn't on Fentanyl. And the doctor said he was on a starting dose. I don't know what could be the difference between a starting dose and the lowest dose. But in any case, he was on Tylenol. And then I maintain the lowest dose, but in any case, the starting dose of OxyContin. And finally, again, you are correct that the defendant never voiced that he was in pain. And he did give appropriate responses to the questions. Justice Moore, you asked about how the police were dressed. And they were dressed in civilian clothes. In answering that question, defense counsel said that the standard of review is de novo. This is a split standard of review. And one thing that seems to be ignored in defendant's brief and in this oral argument is that the standard of review for factual determinations is manifest weight. And a lot of this case deals with this trial court's factual determinations, which this court should be deferential to under the manifest weight standard. The last thing I want to mention before I get into the meat of the case is the state's request to strike the appendix in the defendant's case. I'm not asking that you strike the video. I think the video is absolutely admissible. The state cites it. This court has undoubtedly viewed it. It is very important. At the hearing, the parties agreed to a transcript that was made by a certified court reporter and admitted into evidence. That transcript, by the agreement of both the prosecutor and the defendant, is what everybody agreed the defendant said. Now, on appeal, appellate counsel says, no, it didn't say that. It said this. And in the state's opinion, that is incorrect. If you have agreed that the transcript is admitted into evidence that it's made by a certified court reporter, then that's what counts, not what appellate counsel thinks it says. For the most part, this is immaterial. But it's critical on, let's see, it's... Well, is that transcript the last word? Or on a de novo review, are we able to look at the video? You are absolutely... The transcript is correct? You are absolutely able to look at that video and say, I think it says this. But for defense counsel to put in a transcript and say, this is what it says. He's saying it's not unintelligible. It says, did you say my prints were on the taser? That's not his decision to make. The transcript is what was admitted. That's what we start with. We've got two things here. We've got the video and we've got the transcript. We don't have a third thing, which is what defense counsel thinks it says. And the thing is, this becomes critical in one particular place, which is where the transcript says unintelligible and defendant says, defense counsel says that it says, did you say my prints was on the taser? Well, maybe you think it says that. Maybe you think it says something else. That's your decision to make. But it is not the decision of appellate counsel. And this becomes critical because defendant takes this sentence that he thinks is there and uses it to claim that the police officer's statement in court was false. And I strongly disagree with that for a number of reasons. Again, the number one thing is that's not what the transcript says. But the second thing is, is that defense counsel takes this statement that he has injected into the record and says, well, the fact that the verb there is past tense. Did you say, did you say my prints was on the taser? And says, well, that means that the police officer was, had talked to the defendant before and told him that his prints was on the taser. But officer Mormon's answer was, yes, I said that, excuse me. Officer Mormons just said, yes, they are, excuse me. I have, that was a major faux pas on my part. The question defendant says is on there is, did you say my prints was on the taser? And Mormon says, yeah, they are. Now, that does not indicate that he had spoken to the defendant and told him that in the past. He's answering the meat of that question. It was, which is first prints on the taser. If he had said, yes, I said that, then defendant's argument would make sense that he had told him that in the past. But all he said was, yeah, they are. Yeah, the prints are on the taser. That in no way indicates that the police were lying, that the police had talked to him in the  So does that answer your question? Justice? Yeah, I think the council is submitting that transcript for the sake of arguing that this is what he thinks we should find that was said, and we have a de novo review. And he'll have an opportunity to respond to that. But on another note, if he uses a past tense preterite, rather than a past tense subjunctive, are we able then to correct his grammar in finding what he meant? I think this court's going to be very busy correcting the grammar of this defendant. No offense meant there at all. But let's look at the police officer's grammar, which is present tense, that yes, they are. So whether the defendant said, did you say my prints was on the taser or not, is your decision to make. That's my point. It's your decision to make. It is not defense counsel's decision to make. But in any case, the answer in no way proves that there had been a prior conversation with the defendant. Okay. Okay. Okay. Any other questions? It's clear as the summer sun, Shakespeare would have said. So, Ms. Chanahan, the state is moving to strike the appendix. Yes. Except for the video. Oh, absolutely. Just, well, the appendix is only defense counsel's list of the two, comparing the two. But regardless, again, the decision of what is said on this video is yours to make. And I think it supports the trial court's position. And I think very clearly, I know I'm out of time, but I would point this court to two cases that the state cited, Beltran and Vasquez, that both deal with defendants in a very, very similar case. I mean, one of them was on a backboard in the ER and was strapped down. Now, your first reaction is he can't leave. But the police didn't do that. The hospital did that. The decision to take the straps off would not be the police's decision. It would have been a medical decision. Both Beltran and Vasquez, I think, are extremely instructive in this case. And I finally note that this case was not decided solely on the video or the video on the transcript. We do have the doctor, we do have two police officers, and we do have the defendant. Okay. Thank you very much. Justice Moore? No other questions. All right. Mr. Krieger, how do you respond? So opposing counsel claimed that everyone agreed to the transcript. There was no stipulation. That's not true. Now, in terms of the grammar, you- Mr. Krieger, question. Was this dispute raised and discussed and resolved at the trial court level? Was this before the trial court? The video was before the trial court. Defense counsel- There's a question about the dispute about the transcript. No, this particular transcript was not pointed out. Defense counsel pointed to other aspects where there was evidence that was outside of the video that indicated there had been an earlier confrontation. Before this exchange, my client mentions a taser, which had not been mentioned before. And later on- Was the transcript argument before the court in a post-trial motion? No, but the video was, Your Honor. There's no rule of forfeiture that says you need to cite every single piece of evidence. The question of preservation goes to claims rather than goes to individual points, and it certainly doesn't go to individual facts. All the time, a public counsel will cite a fact that wasn't mentioned in the argument below, but it could still be addressed because the court looks at the entire record. I'm not aware of any such strict argument with regard to procedural default that says if a particular fact isn't mentioned, it can't be raised on appeal. What about the motion to strike? The motion to strike is frivolous. The video was properly before you. There's nothing wrong with me including my interpretation. If Your Honors disagree with my interpretation and listen, then Your Honor should absolutely find that I'm mistaken. And if opposing counsel had offered her own interpretation and said that that's not what Opposing counsel hasn't offered a different interpretation. She hasn't argued that, in fact, it's unintelligible. And that's what he said. Now, the question- Do you agree with counsel that it's for us to say on a de novo review what actually was said? I'm sorry? Do you agree with opposing counsel that it's for us to decide on a de novo review what it actually said? Yes. Yes, Your Honor. The parties and Your Honors are in just as good a position to interpret the video as anyone else's. So the review is de novo. But also say the question of, well, opposing counsel is correct that factual determinations are given deference. There is actually very few factual determinations over conflicted evidence. Most of the facts were agreed to by both parties, weren't disputed by the parties. But with regard to the specific question of custody, we cited the Logan case and the Braggs case where the U.S., excuse me, the Illinois Supreme Court reviewed questions of custody without any mention of a deferential standard. It makes sense often when we're applying facts to a legal question, it would be de novo. So the question of custody, which is really, I think, the crucial question with regard to argument one, would be one that was reviewed de novo. Now, with regard to the specific question that was disputed, my client asked, did you say my prince was on the Taser? And even though opposing counsel doesn't like my client's grammar, it was a perfectly cogent question. Did you ask about this? And he said, yes, they are. If he had not confronted my client with the Taser, if he hadn't said that, don't you think he would have said, what are you talking about? What do you mean? Did I say that? And that's not what happened. He admitted to it. He admitted to the evidence and therefore admitted to the confrontation. And there was other evidence of that. Later on, my client says, well, Will Jenkins is co-offender. Did he really say that? And Detective Mormon says, yeah, we found him last night. Didn't you think his loyalty went a little deeper than that? Why would the detective be mentioning that unless he had said earlier, consistent with my client's testimony, that he had confronted him before the videotape was turned on? There's no other way to understand that without crediting my client's testimony, at least on that point. Now, with regard to the invocation on the 11th and on the 13th, we're taking the officer's words for that. They had the ability to videotape it on the 11th. They had the ability to videotape it on the 13th, and they chose not to. And I think their use of videotape shows their control of the situation. The failure to do so consistently raises questions about their credibility. Unless your honors have any questions. Okay, Justice Moore. No other questions. Okay. Thank you both for your arguments here today. This matter will be taken under advisement. We will issue an order in due course. The court will be in a five-minute recess.